**ESSEX CRANE RENTAL CORP.,**
**Plaintiff–Counter–Defendant–Appellee,**

v.

**WEYHER/LIVSEY CONSTRUCTORS, INC.,**
**Defendant–Counter–Claimant–Appellant.**

No. 90–35340.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 11, 1991.

Decided July 31, 1991.

Ronnie B. Rock and Denise C. Baird, Moffatt, Thomas, Barrett, Rock & Fields, Boise, Idaho, for defendant-counter-claim-ant-appellant.

G. Lance Salladay, Risch, Goss, Insinger & Salladay, Boise, Idaho, for plaintiff-counter-defendant-appellee.

Before WRIGHT, BRUNETTI and LEAVY, Circuit Judges.

LEAVY, Circuit Judge:

On January 26, 1987, a crane leased to Weyher/Livsey Constructors by Essex Crane Rental Corporation collapsed, fatally injuring an employee of Weyher/Livsey. The employee's family initiated a wrongful death action in Idaho state court, naming Essex as one of the defendants. Essex filed this diversity action pursuant to 28 U.S.C. § 1332 (1988), seeking declaratory and other relief, including indemnity. Weyher/Livsey counterclaimed for damages. At conflict is the terms of the contract for the lease of the crane. Not surprisingly, each document prepared by each company requires the other party to indemnify if personal injury should occur.

The district court granted partial summary judgment in favor of Essex. *See Essex Crane Rental Corp. v. Weyher/Livsey Constructors, Inc.,* 713 F.Supp. 1350 (D.Idaho 1989).

## FACTS AND PRIOR PROCEEDINGS

On May 5, 1986, Clayton Record, Weyher/Livsey's Project General Superintendent, contacted Robert Stork, an Essex salesman, to inquire about renting a crane. Essex shipped the crane from its location in Oregon to the Lucky Peak, Idaho, job site. There, it was inspected, assembled, and placed into use by Weyher/Livsey. Delivery was apparently completed on or around May 9, 1986. On May 12, 1986, Stork and Record prepared, and each signed, a handwritten note that reads as follows:

78 model minimum or newer

3900 W series II 240′ main 30′ jib

5,500 per mo. max flat rate/no overtime charges

no inbound

no outbound

12 mo. min.

o/t rate 3500.00 to assist w/ inbound transportation once month only

No rental agreement. 5/12/86

PO = 3039P–02400 [1]

On May 13, 1986, Carl Morano, Essex's Comptroller, sent a letter and three copies of a standard lease agreement, numbered 03190, to Weyher/Livsey in care of Clayton Record. Morano's letter requested that Weyher/Livsey sign all copies of the lease and return them to Essex. The printed terms of the lease agreement included a clause whereby "[t]he Lessee shall indemnify Lessor and hold harmless against all loss, damage, expense and penalty arising from any action on account of personal injury or damage to property occasioned by the operation ... of any Equipment while in your possession." The lease agreement also contained a merger clause.[2]

On May 27, 1986, Jacob Smit, a Weyher/Livsey project manager, replied to Carl Morano's letter, returning the three copies of the unsigned lease agreement. Smit wrote:

The contents of your standard lease agreement were not reviewed. Our agreement is clearly spelled out in our Purchase Order # 3039P–02400. It is company policy that lease agreements may not be signed by Weyher/Livsey Constructors, Inc. on-site employees. This was discussed at length with your field representative Mr. Robert Stork.

Despite Smit's letter, Essex continued to invoice Weyher/Livsey for the use of the crane, with each invoice referring to Lease Agreement # 03190. When no payment was forthcoming from Weyher/Livsey, Essex demanded an explanation. Weyher/Livsey stated that it would not pay the invoices until Essex signed a purchase order.

In July, 1986, Weyher/Livsey forwarded a purchase order, numbered 3039R00100, to the attention of Robert Stork at Essex. The purchase order also contained a merger clause. The purchase order incorporated, also in typewritten print, all the same terms as the original handwritten note:

1. This is a reference to a purchase order number.

2. A merger clause is a provision in a contract to the effect that the written terms may not be varied by prior or oral agreements because all such agreements have been merged into the written document. *See* U.C.C. § 2–202.

Crane Rental: as follows
Prox. value: $350,000.00
1979 Model or newer
3900 W Series 2 Vicon Crawler Crane
SN: 395178
240' Main boom. # 123.30' jib
load block, ball and hook
rate—$5,500.00 mo. maximum
12 month minimum rent
overtime rate—$3,500.00 to assist w/ inbound transportation for one (1) mo. only
No inbound freight
No outbound freight (store and load)
W/L to insure
Property taxes

Carl Morano signed the purchase order on July 25, 1986, on behalf of Essex and returned it to Weyher/Livsey. However, immediately before his signature, Morano wrote: "subject to our Lease # 03190."

Thereafter, no further correspondence regarding the Essex lease agreement or the Weyher/Livsey purchase order was exchanged between the parties. Essex continued to invoice Weyher/Livsey, referring specifically to its Lease Agreement 03190 on each invoice. Weyher/Livsey paid each invoice without any reference to the Essex lease agreement.

In early July 1986, before Weyher/Livsey had issued its purchase order, the engine of the crane needed repair. At Weyher/Livsey's request, Essex made arrangements to perform the repairs over the Fourth of July weekend. In its post-repair correspondence with Weyher/Livsey dated July 24, 1986, Essex requested compensation for overtime repairs "Per our Lease Agreement." Weyher/Livsey objected to the request for payment, but did not specifically challenge Essex's reference to its lease agreement.

In December 1986, the crane again needed repairs, which were performed by Essex at Weyher/Livsey's request. According to Essex, the significance of the repairs is that only the Essex lease agreement contained a provision that obligated Essex to repair the crane for "other than normal wear and tear." Because Weyher/Livsey wanted Essex to repair the crane for "oth-

er than normal wear and tear," Essex claims Weyher/Livsey specifically relied on contract terms found only in the Essex lease agreement.

On January 26, 1987, the tragic accident which underlies this litigation occurred. In March of 1987, Essex filed this action seeking declaratory relief. Weyher/Livsey filed a counterclaim against Essex for breach of express warranty, negligence, and strict liability. Then, Essex filed two motions for partial summary judgment, asserting that Weyher/Livsey's counterclaims lacked merit and that it was entitled to judgment on the issue of indemnity. Weyher/Livsey also moved for partial summary judgment, asserting that its purchase order was binding as a matter of law.

In a memorandum order and opinion dated May 25, 1989, the district court granted partial summary judgment in favor of Essex as to Weyher/Livsey's duty to indemnify Essex, and denied Weyher/Livsey's cross-motion for partial summary judgment. The court also ruled in favor of Essex on Weyher/Livsey's counterclaims, holding that those claims were resolved by its holding that the Essex lease agreement was the contract of the parties. The district court decided that "the offer embodied in the [Essex] lease agreement was accepted [by Weyher/Livsey], despite the fact that it was not signed, by virtue of Weyher/Livsey's acceptance of benefits under the agreement," and thus, the terms of the Essex Lease Agreement controlled. *Essex Crane Rental*, 713 F.Supp. at 1355.

Essex moved for certification of final judgment pursuant to Federal Rule of Civil Procedure 54(b). The district court entered a judgment and a Rule 54(b) certificate on March 16, 1990.

## DISCUSSION

*Standard of Review*

We review a grant of summary judgment de novo. *Darring v. Kincheloe*, 783 F.2d 874, 876 (9th Cir.1986). Viewing the evidence in the light most favorable to the non-moving party, we must determine whether there are any genuine issues of

material fact and whether the district court correctly applied the relevant law. *Ashton v. Cory,* 780 F.2d 816, 818 (9th Cir.1986).

## ANALYSIS

*Apparent Authority*

The district court concluded that the handwritten note signed by Robert Stork of Essex and Clayton Record of Weyher/Livsey did not control the transaction between the parties. The court stated:

> The first document which arguably controls is the Stork–Record memorandum. If this were the controlling document, it would be advantageous to Weyher/Livsey, since it apparently incorporates a Weyher/Livsey purchase order by reference. However, it is not.

> Uncontroverted evidence has been placed in the record which shows that Stork had no authority to bind Essex. Also, Record has stated in his deposition that he could not bind Essex [sic], except on occasions when Smit was not available, in which case Record would sign "for Jacob Smit." Record did not sign the May 12th document on Smit's behalf. Because of this lack of authority on both sides, it would also be improper to construe the memorandum as an offer by either side.

*Essex Crane Rental,* 713 F.Supp. at 1354.

■ Construing the evidence most favorably to Weyher/Livsey, and applying the Idaho law related to agency, we conclude that the district court erred in granting summary judgment in favor of Essex. Under Idaho law, which reflects the majority rule, apparent authority

> is created when the *principal* 'voluntarily places an agent in such a position that a person of ordinary prudence, conversant with the business usages and the nature of a particular business, is justified in believing that the agent is acting pursuant to existing authority.' Apparent authority cannot be created by the acts and statements of the agent

alone.... [W]here the existence of an agency relationship is disputed—whether or not there is apparent authority on the agent's part to act as he acted—it is a *question for the trier of fact* to resolve from the evidence.

*Bailey v. Ness,* 109 Idaho 495, 497–98, 708 P.2d 900, 902–03 (1985) (citations omitted; emphasis in original).

■ The following facts create a factual dispute as to whether Stork had apparent authority from Essex to bind Essex to the handwritten note Stork and Record prepared and signed on May 12, 1986:

(1) Record knew that Stork had gone to work for Essex Crane, having terminated his previous employment;

(2) Stork represented to Record that Essex had the crane Weyher/Livsey required;

(3) Record testified in his deposition that he informed Stork that he would not sign any of the Essex rental or lease agreements;

(4) Stork then signed Record's handwritten note containing the terms regarding the crane transaction;

(5) Record's testimony regarding the signing of the handwritten note indicates that Record perceived Stork as having the authority to negotiate and enter into agreements on behalf of Essex;

(6) Stork's affidavit states that he discussed ... the crane desired by Weyher/Livsey, as to size, equipment, capacity, agreed on the rental rate without overtime, term of lease, transportation arrangements, and the necessity of Weyher/Livsey to obtain insurance coverage so that the interests of Essex would be fully protected both with respect to the leased equipment and as to liability during the time the crane was in the possession and control of W/L, all of which was to be included on the formal purchase order, which I understood Weyher/Livsey was to have issued immediately to formalize the crane lease.[3]

---

**3.** If on remand the statements by Stork are found to be true, we find that given the breadth of this discussion a person of ordinary prudence, conversant with the crane rental business, would be justified in believing that Stork had authority to enter agreements on behalf of

(7) Carl Morano, Essex's comptroller, stated in his deposition that Essex's salespeople provide quotations[4] to a potential customer to "get the rental in place";

(8) Weyher/Livsey apparently believed Stork had the authority to enter agreements on behalf of Essex, because it sent its purchase order No. 3039R00100, dated July 5, 1986, to him at Essex;

(9) an Essex Crane Rental Order invoice, with the number of the Essex Lease Agreement, No. 3190 on it, states "By Bob Stork."

With this evidence, it cannot be said as a matter of law that Record or Weyher/Livsey, acting with ordinary prudence, were unjustified in believing that Stork acted pursuant to authority granted to him by Essex.

Moreover, there is a genuine issue of material fact as to whether Record could bind Weyher/Livsey. The district court found that Record could not bind Weyher/Livsey because he did not sign the handwritten note on behalf of another Weyher/Livsey employee, Jacob Smit. *Essex Crane Rental*, 713 F.Supp. at 1354. However, Record testified that "[w]hen Jacob's not on-site my signature has to take his place. In that respect I'm authorized to sign any document that comes or goes through the project." Clayton Record Deposition, at 60. Although Record testified that if Smit is not on site, he accompanies his signature with "for Jacob Smit," he did not testify that an omission of this phrase necessarily negated his authority "to sign any document." Finally, Essex believed Record had authority because it sent its

lease agreement No. 03190 to him at Weyher/Livsey.

Because the parties dispute Record's apparent authority, a trier of fact must resolve the dispute.

### Essex Rental Agreement

■ Weyher/Livsey presented evidence that raises a genuine issue of material fact as to whether it assented to the Essex rental agreement. First, Weyher/Livsey never signed the agreement. Instead, Smit of Weyher/Livsey wrote to Essex that the agreement had not been reviewed, and returned all copies of it. Although the district court ruled Smit's letter was not a rejection because "Smit's letter nowhere stated that the terms of the lease agreement were unacceptable," *Essex Crane Rental*, 713 F.Supp. at 1355, we find that Smit's actions could be interpreted as a rejection. Smit explained in the letter that the contract was already embodied in a Weyher/Livsey purchase order.

Second, Weyher/Livsey refused to make lease payments until its own purchase order was signed by Essex. It sent Essex a purchase order, albeit two months later, and started making payments only after obtaining the signature of Essex on this order.

### Effect of Worker's Compensation Law

■ If on remand the court determines that the Essex lease agreement governs this dispute, the court must then determine whether Idaho Code § 72–209(2) (1989) limits Weyer/Livsey's liability to Essex.

Idaho Code Section 72–209(2)[5] limits the amount of indemnity an employer is required to provide to a third party "to the

---

Essex. Of course, Weyher/Livsey would also need to show that Essex voluntarily placed Stork in this position. *See Bailey*, 109 Idaho at 497, 708 P.2d at 902.

4. Neither the district court records nor the excerpt of record contain the full deposition of Carl Morano, in which he apparently explains what was meant by a "quotation." In the absence of this evidence, we must interpret the evidence in the light most favorable to Weyher/Livsey. Thus, we interpret "quotations" broadly.

5. Section 72–209(2) states:

The liability of an employer to another person who may be liable for or who has paid damages on account of an injury or occupational disease or death arising out of and in the course of employment of an employee of the employer and caused by the breach of any duty or obligation owed by the employer to such other person, shall be limited to the amount of compensation for which the employer is liable under this law on account of such injury, disease, or death, unless such other person and the employer agree to share liability in a different manner.

amount of compensation for which the employer is liable under this law":

> [I]t seems clear that I.C. § 72–209(2) was intended to put a ceiling on third party indemnity claims against the employer, except in those cases where the claim is based on an express contractual indemnity provision.

*Pocatello Indus. Park Co. v. Steel West, Inc.,* 101 Idaho 783, 790, 621 P.2d 399, 406 (1980).

The district court found there was an express contractual indemnity provision between Weyher/Livsey and Essex in that "Paragraph 11 of the lease agreement expressly states that the lessee will indemnify the lessor against any loss or damages on account of personal injury...." Therefore, the court found that section 72–209(2) was not violated. *Essex Crane Rental,* 713 F.Supp. at 1360.

This conclusion was in error. If on remand the court determines that the Essex lease agreement is the controlling document, it should find that § 72–209(2) limits Weyher/Livsey's indemnification to Essex to the amount that Weyher/Livsey is responsible for under Idaho worker's compensation law. The mere existence of an indemnity clause in the rental agreement does not support an express agreement to indemnify.

We hold there is insufficient evidence for a trier of fact to find that the parties entered an express agreement for Weyher/Livsey to indemnify Essex. First, the evidence does not support an express agreement, as section 72–209(2) requires. Weyher/Livsey informed Essex that it did not review Essex's several-page lease agreement, with its indemnity clause. Instead, Weyher/Livsey returned the agreement, unsigned, to Essex, explaining that the contract was embodied in Weyher/Livsey's purchase order. This conduct cannot sustain the express agreement to indemnify that section 72–209(2) requires. *Cf. Rosendahl Corp. v. H.K. Ferguson Co.,* 211 Cal.App.2d 313, 27 Cal.Rptr. 56,

57–58 (1962) (in lease of crane, a binding agreement to indemnify was established by conduct where the indemnity provisions appeared on a single sheet of paper, were clearly evident, and the employer signed nine separate forms containing the indemnity clause without ever objecting to the clause).

Second, the Idaho Supreme Court has interpreted section 72–209(2) to limit the amount of an employer's liability to a third party where there is an implied promise of indemnity.[6] *Pocatello,* 101 Idaho at 790–91, 621 P.2d at 406–07. The purpose of section 72–209(2) would be thwarted if a promise to indemnify, and an express one at that, could be implied from such conduct as Weyher/Livsey exhibited. The district court's ruling on acceptance by conduct is analogous to implying a promise to indemnify, in which case Weyher/Livsey's liability must be limited, not expanded. *See id.* at 790–91, 621 P.2d at 406–07.

*Conclusion*

The grant of partial summary judgment in favor of Essex was in error. Therefore, we reverse the grant of summary judgment on Essex's claim for declaratory relief and for indemnity. We also reverse and remand the district court's rulings on the Weyher/Livsey counterclaims for breach of warranty, negligence, and strict liability, because those rulings were dependent on the court's holding that the Essex agreement was the contract of the parties.

REVERSED AND REMANDED.

---

6. The Idaho Supreme Court explained that this common law indemnity is premised on the theory that the employer was more negligent in causing the injury than was the third party. *See Pocatello,* 101 Idaho at 789–90, 621 P.2d at 405–06.